J. A02039/20

NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| JOSEPH A. BONDS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : | |
| GMS MINE REPAIR & MAINTENANCE, INC., | : : : | No. 1273 WDA 2019 |
| Appellant | : | |

Appeal from the Judgment Entered August 9, 2019,
in the Court of Common Pleas of Washington County
Civil Division at No. 2015-CV-6310

BEFORE:  SHOGAN, J., OLSON, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        FILED DECEMBER 24, 2020

Appellant, GMS Mine Repair & Maintenance, Inc. ("GMS") (defendant below), appeals from the judgment[1] entered on August 9, 2019, in favor of appellees, Joseph A. Bonds, individually and on behalf of all others similarly situated ("the class") (plaintiffs below), in the Court of Common Pleas of Washington County.  After careful consideration, we affirm.

We take the underlying facts and procedural history from our review of the certified record and the trial court's August 12, 2019 opinion.

---

[1] In the caption of their brief, GMS purports to appeal from the order denying its post-trial motions.  However, an appeal does not lie from the denial of post-trial motions.  Jackson v. Kassab, 812 A.2d 1233, 1233 n.1 (Pa.Super. 2002), appeal denied, 825 A.2d 1261 (Pa. 2003) (parallel citation omitted). We have amended the caption accordingly.

On August 23, 2013, a class action complaint identifying Joseph Bonds as an individual plaintiff was filed in Federal Court in the Western District of Pennsylvania. 25 months later (9/23/2015), after substantial pre-trial litigation, Senior District Judge Terrence F. McVerry partially granted GMS' motion for summary judgment. Judge McVerry granted summary judgment as to [the class'] claim of a violation of the [f]ederal Fair Labor Standards Act (FLSA). Judge McVerry denied summary judgment as to the [class'] state related claims. Also, Judge McVerry denied both the [the class'] motion for class certification pursuant to FRCP 23 and GMS' motion for decertification of a conditionally certified collective action. Judge McVerry declined to exercise supplemental jurisdiction over the [class'] state law claims.

On October 1, 2015, this matter was transferred to the Court of Common Pleas of Washington County. On November 18, 2015, [the class] filed a [s]econd [a]mended [c]omplaint asserting claims that included: breach of contract; unjust enrichment and violations of the Pennsylvania Minimum Wage Act (PMWA) [43 P.S. §§ 333.101-115] for which they sought relief under the Pennsylvania Wage Payment and Collection Law (WPCL) [43 P.S. 260, et seq.]. On January 30, 2017, the Hon. Damon Faldowski granted [the class'] motion for class certification.

On December 12, 2017, Judge Faldowski denied GMS' summary judgment motion. In a well-reasoned opinion that reflected a clear understanding of the principles of federalism, Judge Faldowski concluded that [the class'] PMWA claim did not fail "simply because the FLSA claim has already been disposed of by the federal court." Citing the published opinions of multiple [f]ederal [d]istrict [c]ourt [j]udges, Judge Faldowski noted that the PMWA provides more protection for employees than the FLSA, which was intended to "establish a national floor under which wage protections cannot drop. . ."[.]

On February 5, 2018, this trial court granted GMS' motion to certify for interlocutory appeal pursuant to 42 Pa.C.S.[A.] § 702(b). The issue certified was whether the pre-shift and post-shift activities in this case constituted compensable "work" under the PMWA. On March 28, 2018, the Pennsylvania Superior Court refused to grant GMS' interlocutory appeal.

Following jury selection on September 17, 2018, the parties proceeded to trial between September 24 through 26, 2018. Much of the trial evidence consisted of testimony of class members Joseph Bonds, Luke Horvath, Shane Baker, Joshua Wade, Timothy Cramer and Joshua Roth, all of whom worked for GMS at Consol Enlow Fork Mine. Mr. Bonds, the class representative, described the hiring process with GMS. After filling out an on-line application, he attended an interview at a GMS work trailer in Waynesburg, Pennsylvania. GMS hired him to do underground mining. He received a "verbal" but not written offer of employment with GMS. Mr. Bonds was hired as [an] hourly worker to work shifts, designated in 8 hour increments. Mr. Bonds stated that he and other GMS miners were required to attend pre-shift safety meetings. After starting work at the Enlow Fork Mine, Consol determined that the parking lot nearest to the mine's bathhouse could no longer be used by GMS employees. In April of 2012, GMS employees were directed to park at a satellite lot located "at the top of the hill" some distance from the bathhouse. GMS responded by initially directing their employees to arrive at the premises 15 minutes earlier for scheduled shifts. 30 to 45 days later, GMS changed the report time to thirty minutes prior to the miners' scheduled shift. GMS workers were not permitted to walk from the satellite parking lot to their customary reporting location. GMS workers were also not permitted to have a Consol worker transport them from the satellite lot to the bathhouse or to have a spouse drop them off at the bathhouse.

The class members testifying at trial all indicated that GMS workers for all shifts were required to report 15,

and then shortly thereafter, 30 minutes prior to their shift for the purpose of getting onto a GMS shuttle which then transported them to the Consol Mine bathhouse. Those miners who failed to make the shuttle on time were disciplined or sent home. Post-shift, GMS Miners were required to wait between 10 and 30 minutes for a shuttle to take them to a satellite parking lot. GMS Supervisor, B.J. Gales, told Mr. Bonds and other miners that no payment would be made for additional pre and post shift time the miners were required to be on premises. No payment was made for the early report time or mandated attendance at pre-shift safety meetings which occurred two to three times per week.

At the close of all evidence, this trial court granted a directed verdict in favor of GMS with regard to [the class'] unjust enrichment claim. Further, this trial court decided that the jury should first determine the [c]lass' liability claims and special interrogatories regarding the amounts of time [the class] was required to work pre and post shift.

Following several hours of deliberation, the jury found for [the class]. Specifically, the jury determined that:

1.     [The class] proved by a preponderance of the evidence that GMS violated the Pennsylvania Minimum Wage Act of 1968.

2.     The [c]lass proved by a preponderance of the evidence that the van report time was 15 minutes before the stated shift for 30 days.

3.     The [c]lass proved by a preponderance of the evidence that each member was required to work 15 minutes per shift before the shift while the van report time was 15 minutes before the stated shift.

4.     The [c]lass proved by a preponderance of the evidence that the van report time was

30 minutes before the stated shift for 687 days.

5. The [c]lass proved by a preponderance of the evidence that each member was required to work 30 minutes per shift before the shift while the van report time was 30 minutes before the stated shift.

6. The [c]lass proved by a preponderance of the evidence that each member was required to work 15 minutes per shift after the shift from April 27, 2012 through April 14, 2014.

7. The [c]lass proved by a preponderance of the evidence that GMS breached an oral contract by failing to pay the class members for pre-shift and/or post-shift time.

8. Regarding the Breach of Contract damages, the jury repeated findings 2 through 6.

This trial court bifurcated the issue of a proper calculation of the [class'] damages.[Footnote 3] At post-verdict conferences on October 5, 2018, November 14, 2018 and November 16, 2018, the parties and this trial court discussed the appropriate manner in which to proceed regarding the calculation of [the class'] damages. At the November 16, 2018 conference, GMS [c]ounsel conceded that incomplete wage and hour records had been supplied to [the class]. This trial court denied [the class'] corresponding motion for sanctions due to GMS' non-disclosure as it appeared to be an unintentional error.

[Footnote 3] On several occasions prior to trial, [c]ounsel for GMS argued that a bifurcation of the damages calculation was necessary.

> Ultimately, on April 16, 2019, the parties stipulated to an amount of "wage damages." The parties stipulated to "wage damages" in the amount of $1,186,853.63 based upon the jury verdict. In addition to this stipulated sum, [the class] also [sought] an award of attorney's fees and costs pursuant to 43 Pa.C.S.[A.] § 260.9a, liquidated damages pursuant to 43 Pa.C.S.[A.] § 260.10, and pre-judgment interest.
>
> On July 12, 2019, the parties appeared for argument on post-trial motions. No testimony was presented regarding damages. Instead, on the basis of their stipulation and respective submissions, the parties put this matter to decision. On the basis of the parties' post-trial motions, [the trial court determined the following issues]:
>
> 1) The appropriate award of statutory attorney's fees and costs;
>
> 2) The propriety of awarding liquidated damages;
>
> 3) The propriety of awarding post-judgment interest;
>
> 4) Whether this trial court erred in failing to grant summary judgment;
>
> 5) Whether this trial court erred in failing to grant a compulsory non-suit or direct a verdict on [the class'] PMWA/WPCL and breach of contract claims; and
>
> 6) Whether this trial court erred in certifying and refusing to decertify the class.

Trial court opinion, 8/12/19 at 1-8 (record citations omitted, most footnotes omitted.)

The trial court determined the class was entitled to attorneys' fees in the amount of $349,865.00. (Id. at 9-14.) It awarded the class costs in the

amount of $25,562.53. (Id. at 14.) It further held the class was owed liquidated damages in the amount of $405,028.64. (Id. at 15-19.) It also gave it pre-judgment interest in the amount of $418,132.07. (Id. at 20-23.) The trial court held it properly denied GMS' motion to decertify the class. (Id. at 23-26.) It found GMS' claim the trial court erred in denying summary judgment was not "a proper subject for a post-trial motion." (Id. at 27; see also id. at 27-28.) Lastly, it held GMS was not entitled to either a directed verdict and/or a judgment of non-suit. (Id. at 28-33.) The instant, timely appeal followed.[2]

On appeal, GMS raises the following issues for our review:

[1. Whether the trial court] misconstrued the statutory phrase "hours worked[?]"

[2. Whether the trial court] erred in failing to find that the PMWA claim is precluded by collateral estoppel[?]

[3. Whether the trial court] erred in failing to grant summary judgment, compulsory non-suit directed verdict, or new trial on the oral contract claim[?]

[4. Whether the trial court] erred in failing to grant compulsory non-suit, directed verdict, or new trial on the PMWA claim for post-shift time[?]

[5. Whether the trial court] abused its discretion in awarding fees incurred in another lawsuit[?]

---

[2] The trial court did not order GMS to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and did not author any additional opinion.

[6. Whether the trial court] erred in awarding liquidated damages[?]

[7. Whether the trial court] abused its discretion in awarding pre-judgment interest[?]

GMS' brief at 2.[3]

---

[3] We note GMS raised seven issues in its statement of the questions involved, and, if you consider each of the subparts in issue one to be separate issues, eleven issues on appeal. While this court understands GMS believes the trial court made numerous errors,

> . . . we note that it has been held that when an appellant raises an extraordinary number of issues on appeal, as in this case, a presumption arises that there is no merit to them. In United States v. Hart, 693 F.2d 286, 287 n.1 (3rd Cir. 1982), the court had an opportunity to address this situation:
>
> > Because of the inordinate number of meritless objections pressed on appeal, spotting the one bona fide issue was like finding a needle in a haystack. One of our colleagues has recently cautioned on the danger of "loquaciousness:"
> >
> > > With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors. I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to any of them. I do not say that this is an irrebuttable

In its first issue,[4] GMS contends the trial court, "misconstrued the statutory phrase 'hours worked.'" (GMS' brief at 11.) Specifically, GMS argues: (1) the Department of Labor ("DOL") regulation which defines, "hours worked" violated the Statutory Construction Act ("SCA") (id. at 14-16); (2) the regulation is not valid because the DOL exceeded its authority (id. at 16-20); (3) the phrase "hours worked" should be construed in accordance with the FLSA (id. at 27-29); (4) the trial court failed to construe the phrase "hours worked" according to its plain meaning (id. at 11-13); and (5) this court's decision in Lugo v. Farmer's Pride, Inc., 967 A.2d 963 (Pa.Super. 2009), appeal denied, 980 A.2d 609 (Pa. 2009) (parallel citation omitted), is not controlling (GMS' brief at 20-27).[5] We disagree.

---

> presumption, but it is a presumption nevertheless that reduces the effectiveness of appellate advocacy. Appellate advocacy is measured by effectiveness, not loquaciousness.
>
> Aldisert, The Appellate Bar: Professional Competence and Professional Responsibility—A View From the Jaundiced Eye of One Appellate Judge, 11 Cap.U.L.Rev. 445, 458 (1982).

Estate of Lakatosh, 656 A.2d 1378, 1380 n.1 (Pa.Super. 1995).

[4] GMS' brief fails to comply with the Rules of Appellate Procedure; in particular, Rule 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued[.]"). See 42 Pa.C.S.A. § 2119.

[5] For ease of disposition, we have reordered the subparts in GMS' first issue.

When this court engages in statutory interpretation, we must be mindful of the following:

> [a]s in all cases of statutory interpretation, our goal is to ascertain the intent of the General Assembly in adopting the statute. 1 Pa.C.S.[A.] § 1921(a). In doing so, we must, if possible, give effect to all the provisions of a statute. 1 Pa.C.S.[A.] §§ 1921, 1922. "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.[A.] § 1921(b). Only when the words are ambiguous may we look to the general purposes of the statute, legislative history, and other sources in an attempt to determine the legislative intent. 1 Pa.C.S.[A.] § 1921(c). In construing a statute, the courts must attempt to give meaning to every word in a statute as we cannot assume that the legislature intended any words to be mere surplusage. Furthermore, we should avoid construing a statute in such a way as would lead to an absurd result. 1 Pa.C.S.[A.] § 1922.

Holland v. Marcy, 883 A.2d 449, 455-456 (Pa. 2005) (parallel citation omitted).

In its first subpart, GMS claims, "the [DOL] regulations defining the phrase 'hours worked' is an invalid statutory interpretation violative of the SCA." (GMS' brief at 14; see also id. at 14-16.) In its second subpart, GMS argues the regulation is invalid because DOL exceeded the authority delegated to it by the legislature. (GMS' brief at 16-20.) We disagree.

The regulation at issue is found at 34 Pa. Code § 231.1(b), which provides in pertinent part:

§ 231.1. Definitions.

. . . .

    (b)    In addition to the provisions of subsection (a), the following words and terms, when used in this chapter, have the following meanings, unless the context clearly indicates otherwise:

. . . .

Hours worked--The term includes time during which an employee is required by the employer to be on the premises of the employer, to be on duty or to be at the prescribed work place, time spent in traveling as part of the duties of the employee during normal working hours and time during which an employee is employed or permitted to work; provided, however, that time allowed for meals shall be excluded unless the employee is required or permitted to work during that time, and provided further, that time spent on the premises of the employer for the convenience of the employee shall be excluded.

34 Pa. Code § 231.1(b).

In Bayada Nurses, Inc. v. Commonwealth, Dept. of Labor and Industry, 958 A.2d 1050 (Pa.Cmwlth. 2008),[6] affirmed, 8 A.3d 866 (Pa. 2010), an employer raised a challenge to the validity of this same regulation,

---

[6] While decisions of the commonwealth court are not binding upon us, they may serve as persuasive authority. See Commonwealth v. Ortega, 995 A.2d 879, 885 (Pa.Super. 2010), appeal denied, 20 A.3d 1211 (Pa. 2011).

arguing the DOL engaged in an invalid exercise of legislative rulemaking power and challenged the regulatory definition of the phrase "domestic services" as being at odds with both the FLSA and the plain meaning of the phrase. Id. at 1054-1055. In rejecting this challenge, the commonwealth court stated:

> The rules of statutory construction apply to regulations. See Highway News, Inc. v. Pennsylvania Department of Transportation, 789 A.2d 802 (Pa.Cmwlth. 2002). See also Section 1921(a), (b) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a),(b) (providing that every statute should be construed, if possible, to give effect to all provisions with each word given meaning and not treated as mere surplusage). Moreover, a court may not substitute its discretion for that of the administrative agency acting within the boundaries of its powers, absent fraud, bad faith or abuse of power. Rohrbaugh v. Pennsylvania Public Utility Commission, 556 Pa. 199, 727 A.2d 1080 (1999). In Hosp. Ass'n of Pa. v. MacLeod, 487 Pa. 516, 410 A.2d 731 (1980), the court noted that administrative interpretations are guides to legislative intent when not disturbed by the legislature.
>
> Notably, the . . . regulatory definition ha[s] not changed since [its] original enactment. . . . Hence, the regulatory definition tracks the MWA's meaning and does not violate legislative intent. DRB, Inc. v. Pennsylvania Department of Labor and Industry, 853 A.2d 8 (Pa.Cmwlth. 2004), aff'd, 585 Pa. 8, 887 A.2d 1216 (2005).
>
> . . . .
>
> In Rohrbaugh the Supreme Court explained the distinctions between rules adopted under administrative agencies' legislative rulemaking power and their interpretative rulemaking power. The former, known as substantive rules or regulations, result from legislative power granted by the legislature and establish new law, rights or duties and

"enjoy a general presumption of reasonableness." Borough of Pottstown v. Pennsylvania Municipal Retirement Board, 551 Pa. 605, 610, 712 A.2d 741, 743 (1998). Regulations adopted under legislative rulemaking power have the force of law and are binding on reviewing courts as part of a statute as long as they are within the granted power, issued under proper procedures and are reasonable. Bailey v. Zoning Board of Adjustment of Philadelphia, 569 Pa. 147, 801 A.2d 492 (2002). Interpretative rules or regulations construe a statute and do not expand upon its terms, and courts defer to agency interpretations so long as they are reasonable and genuinely track the meaning of the underlying statute. Id.

. . . .

The legislature has not changed the definition of domestic services in 34 Pa.Code § 231.1(b) since its adoption in 1977. It is now firmly established that administrative interpretations, that are not disturbed by the legislature, represent appropriate guides to legislative intent, Hosp. Ass'n of Pa., and in this regard the [c]ourt acknowledges the rule expressed in Commonwealth v. McClintic, 589 Pa. 465, 909 A.2d 1241 (2006), that the plain language of a statute generally provides the best indication of legislative intent. The Supreme Court has long adhered to the principle of statutory construction that courts must consider the consequences of a particular interpretation and that legislative enactments are generally construed to effectuate their object and to promote justice. Department of Transportation v. Beam, 567 Pa. 492, 788 A.2d 357 (2002).

The MWA grants the Department broad powers to adopt regulations to carry out the statute's purposes of protecting employees from unreasonable and unfair wages and safeguarding the established minimum wage. Section 1 of the MWA. Under Section 9, the Department may adopt regulations that might include but are not limited to defining and governing matters enumerated therein, including "overtime standards"

and the "allowances for such other special conditions or circumstances which may be incidental to a particular employer-employee relationship." When Section 9 is construed liberally, it confers in the Department either legislative or interpretative rulemaking power. As such, the Department acted properly . . . The regulation is reasonable, and it genuinely tracks the underlying meaning of Section 5(a)(2). Where as here the interpretation of an agency charged with enforcing a statute is not clearly erroneous, the interpretation is entitled to great deference and is to be given controlling weight. Riverwalk Casino, L.P. v. Pennsylvania Gaming Control Board, 592 Pa. 505, 926 A.2d 926 (2007).

Id. at 1055-1058 (footnotes omitted).

Here, as in Bayada, the definition of "hours worked" has been in place for over 40 years and has not been disturbed by the legislature. GMS does not distinguish or even acknowledge the existence of the Bayada decision, which our supreme court affirmed, and does not provide any legal support, other than citations to boilerplate language on statutory interpretation, to support its claim the DOL exceeded its authority or the definition of "hours worked" is somehow invalid.

Moreover, while GMS relies on this court's 1964 decision in Department of Labor and Industry, Bureau of Employment Security v. Unemployment Compensation Board of Review, 199 A.2d 474 (Pa.Super. 1964), which it refers to as "Vitolins," such reliance is misplaced. Firstly, Vitolins involved the legitimacy of a newly enacted regulation not an over 40-year-old one. Id. at 476-477. Secondly, Vitolins, which involved a dispute over the meaning of a regulation interpreting unemployment

compensation law, has no factual similarity to the instant matter. Id. Lastly, at most, it stands for the proposition, "[i]t is a fundamental precept of statutory construction that words and phrases be construed according to their common and approved usage." Id. at 477. However, in arriving at the "common and approved usage" of the phrase, "net earnings," which was at issue, our court understood "common and approved usage" was not just the dictionary definition of a word or phrase but instead looked to a variety of different sources, the dictionary, accounting principles, and prior law in determining the proper meaning and usage in professional settings. Id. at 478.

Here, GMS has not done this. Instead, it found a single dictionary definition that supports its preferred interpretation of the phrase "hours worked," and concluded, again with no citation to relevant legal authority, this definition is the only proper definition of the phrase. (GMS' brief at 14-16.) We find the reasoning of Bayada to be persuasive, and GMS has offered nothing to show either the definition of the phrase "hours worked" or the regulation in question is invalid. Thus, the first two subparts of this issue do not merit relief.

In its third subpart, GMS maintains the phrase "hours worked" should be construed in accordance with the FLSA. (GMS' brief at 27-29.) There is no legal support for this claim.

It is well settled the purpose of the FLSA is to establish a floor for the protections to be afforded workers within its scope. See Verderame v. RadioShack Corp., 31 F.Supp.3d 702, 709 (E.D.Pa. 2014) ("The FLSA was meant to establish a national floor under which wage protections cannot drop, not to establish absolute uniformity in minimum wage and overtime standards nationwide at levels established in the FLSA." (citation and emphasis omitted));[7] In re Cargill Meat Solutions Wage and Hour Litigation, 632 F.Supp.2d 368, 393 (M.D.Pa. 2008) (same). This policy reflects Congress' intent "to leave undisturbed the traditional exercise of the states' police powers with respect to wages and hours more generous than the federal standards." In re Cargill, 632 F.Supp.2d at 393 (internal quotation marks and citation omitted). Thus, this Commonwealth has established protections in the area of wage and hour laws that provide supplemental protections above those afforded by the FLSA. Bayada Nurses, Inc. v. Com., Dept. of Labor and Industry, 8 A.3d 866, 883 (Pa. 2010) (upholding more favorable protections for domestic services workers under the PMWA and opining, "the FLSA does not supersede state law; Pennsylvania may enact and impose more generous overtime provisions than those contained under the FLSA which are more beneficial to employees; and it is not mandated that state regulation be

---

[7] We note "decisions of the federal district courts . . . are not binding on Pennsylvania courts, even when a federal question is involved. Nevertheless, these decisions are persuasive authority and helpful in our review of the issue presented." Dietz v. Chase Home Finance, LLC, 41 A.2d 882, 886 n.3 (Pa.Super. 2012).

read identically to, or in pari materia with, the federal regulatory scheme. Thus, we reject Bayada's assertion that federal law compels a different result than that reached by the Commonwealth Court."). Thus, GMS' contention the phrase "hours worked" should have been construed in accordance with the FLSA does not merit relief.

In subparts four and five, GMS takes issue with the trial court's reliance on this court's decision in Lugo, supra. (GMS' brief at 11-13; 20-29.) GMS' argument in these two subparts can be summarized as follows: (1) Lugo was wrongly decided; and (2) because Lugo was wrongly decided, we should adopt what GMS argues is the plain meaning of the phrase, "hours worked." (See id.) At no point does GMS attempt to distinguish this case from Lugo.

As we emphasized to GMS at oral argument, we have no authority to overrule Lugo. See Commonwealth v. Pepe, 897 A.2d 463, 465 (Pa.Super. 2006) ("It is beyond the power of a Superior Court panel to overrule a prior decision of the Superior Court, except in circumstances where intervening authority by our Supreme Court calls into question a previous decision of this Court."), appeal denied, 946 A.2d 686 (Pa. 2008). Moreover,

> our role as an intermediate appellate court is clear. It is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand existing legal doctrines. Such is a province reserved to the Supreme Court. It is well-settled that the Superior Court is an error correcting court and we are

> obliged to apply the decisional law as determined by the Supreme Court of Pennsylvania.
>
> Matter of M.P., 204 A.3d 976, 981 n.2. (Pa.Super. 2019). Further, we "underscore[d] our role as an intermediate appellate court," recognizing that our decisions "may not be disposition-driven[, and w]e are bound by decisional and statutory legal authority, even when equitable considerations may compel a contrary result." Id. Accordingly, we emphasize that any decisional change must originate from our Supreme Court and any statutory change must come from the legislature.

John v. Philadelphia Pizza Team, Inc., 200 A.3d 380, 386 (Pa.Super. 2019) (some internal quotation marks and some internal citations omitted), appeal denied, 221 A.3d 1205 (Pa. 2019).

Further, as noted above, GMS makes no attempt to distinguish this matter from Lugo. In Lugo, we found:

> the term "hours worked" has been defined as a term of art by the regulations supporting the PMWA. It includes all time that the worker is required by the employer to be on the employer's premises and could therefore be found to include the time at issue here for the donning, doffing, and sanitizing of equipment. Under the circumstances of this case, appellants could argue that the regulations supporting the PMWA supply the meeting of the minds because they set firm the meaning of "hours worked." Thus, appellants can maintain an action for breach of contract, and the trial court should not have sustained appellee's preliminary objections as to this cause of action.

Lugo, 967 A.2d at 969 (emphasis added). In explaining how it, at all stages of the proceedings, applied Lugo and defined "hours worked," the trial court stated:

> [i]n this action . . . in pre-trial dispositive motions, and . . . at trial, [the court] endeavored to faithfully apply Lugo. In the context of the class' PMWA claim, this trial court provided to the jury the regulatory definition relied upon and discussed in Lugo. Though GMS requested an embellished definition of "hours worked", their request was not supported by any case authority. This trial court did not preclude GMS from arguing that mandated pre-shift report and post-shift wait times were not "hours worked."
>
> With regard to the class' breach of contract claim, this trial court, during final instructions, did not define the term "hours worked." Instead, this trial court[] provided the jury with suggested standard instructions for all contracts. Such instructions[] informed the jurors as to the requirements of an offer, acceptance and valid consideration. Such instructions informed the jurors that a contract need not be written but could be verbal and its terms derived from the parties' conduct.

Trial court opinion, 8/12/19 at 28-29 (transcript citations and footnote omitted.)

Thus, as GMS does not dispute Lugo's applicability to this matter, as our review of both Lugo and the certified record demonstrates the trial court properly applied it, and as we have no authority to overturn Lugo, we find GMS' first claim to be wholly lacking in merit.

In its second issue, GMS argues the class' claims are precluded by the doctrine of collateral estoppel. (GMS' brief at 29-33.) We disagree.

The doctrine of collateral estoppel precludes relitigation of an issue determined in a previous action where:

> (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

Office of Disciplinary Counsel v. Kiesewetter, 889 A.2d 47, 50-51 (Pa. 2005) (citation and parallel citation omitted).

Here, GMS raised this challenge in its motion for summary judgment; in declining to grant the motion, the trial court addressed the issue as follows:

> [GMS] argues that the doctrine of collateral estoppel precludes [the class] from pursuing their claim under the [P]MWA. Specifically, [GMS] claims that [the class] had the opportunity to fully litigate the [P]MWA claim when the case was initially filed in federal court and, since [GMS'] [m]otion for [s]ummary [j]udgment was granted by Judge McVerry [of the United States Court for the Western District of Pennsylvania], [the class] cannot relitigate this claim before this [c]ourt.
>
> . . . . It is undisputed that the parties in the matter presently before the [c]ourt are the same parties that participated in the proceedings in the [f]ederal [c]ourt. However, it is clear to [the trial court] that [the class] did not have the opportunity to fully litigate the [P]MWA claim.
>
> On September 23, 2017, Judge McVerry issued an [o]pinion and [o]rder granting [GMS'] [m]otion for [s]ummary [j]udgment. Judge McVerry determined that the pre- and post-shift safety meetings were not

- 20 -

> compensable under the [FLSA]. Importantly, Judge McVerry only decided the issues under the federal law and expressly declined to exercise supplemental jurisdiction over the remaining state law claims under the WPCL and [P]MWA. In fact, and in support of his decision to decline jurisdiction, Judge McVerry reasoned that [the class'] WPCL and [P]MWA claims raise novel issues of state law.[Footnote 1]
>
>> [Footnote 1] See [m]emorandum [o]pinion and [o]rder of [c]ourt filed September 23, 201[5] by Judge McVerry in the United States District Court for the Western District of Pennsylvania.
>
> Although Judge McVerry's decision constitutes a final judgment on the merits with respect to [the class'] claims through the lens of the federal law, his decision is not of any consequence to [its] state law claims. [The class] ha[s] yet to have the opportunity to fully litigate the [P]MWA claim since Judge McVerry refused to exercise jurisdiction over the state claims. Therefore, the doctrine of collateral estoppel is inapplicable and [GMS'] [m]otion for [s]ummary [j]udgment as to [the class'] PMWA claim is [denied].

Summary judgment opinion, 12/13/17 at 5-6.

In Murphy v. Duquesne University, 777 A.2d 418 (Pa. 2001) (parallel citation omitted), the appellant filed a claim in federal court under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a), a claim of age discrimination in employment under the Pennsylvania Human Relation Act ("PHRA"), 43 P.S. § 951 et esq., and a common law claim for breach of contract. Murphy, 777 A.2d at 423. As in the instant matter, the federal court granted summary judgment for the appellee on the ADEA claim but declined to exercise supplemental jurisdiction over the PHRA and breach of

contract claims. Id. Subsequently, the appellant discontinued his PHRA claim. Id. On appeal to our supreme court, the appellee argued the appellant's breach of contract claim was collaterally estopped by the federal action. Id. at 435. Our supreme court rejected the claim, finding where the federal court declined to exercise supplemental jurisdiction, it "was not apparent" the appellant had a "full and fair opportunity" to litigate his state law claims. Id.

Here, our review of the federal court decision demonstrates the court specifically declined to rule on the class' state law claims because, "the remaining claims raise novel issues of state law." Bonds v. GMS Mine Repair & Maintenance, Inc., 2015 WL 5602607, at *11 (W.D.Pa. Sep. 23, 2015). In so doing, the federal court noted the United States Court of Appeals for the Third Circuit had long expressed "serious reservations" about the propriety of the federal court's ruling on claims under the relevant Pennsylvania laws. Id. Moreover, the court specifically noted GMS opposed the court's exercising supplemental jurisdiction over the claims, "[p]erhaps aware of this substantive difference in the applicable law[.]" Id.

We have thoroughly reviewed the law and the record and find GMS' contention the class is estopped from bringing its state law claims to be both disingenuous and absurd. GMS provides no legal support for their contention when a federal court declines to exercise supplemental jurisdiction over state-law claims, the litigant is collaterally estopped from bringing those

claims in state court. To make such a finding would result in an untenable situation where litigants either needed to bring claims simultaneously in state and federal courts in order to protect their rights or face the possibility they would have no remedy available under state law if a federal court declined to exercise supplemental jurisdiction. GMS' second claim lacks merit. See Murphy, 777 A.2d at 435.

In its third and fourth issues, GMS maintains the trial court erred in failing to grant summary judgment, a compulsory non-suit, a directed verdict, or a new trial with respect to the breach of contract and in the PMWA claim for post-shift time. (GMS' brief at 33-45.) We disagree.

Initially, we note while GMS argues the trial court erred in failing to grant any of the above, it does not include either our standard of review or the trial court's standard of review for any of these contentions in its brief. Moreover, aside from citing to a few cases with respect to boilerplate contract law standards, it does not cite to any cases which support its contentions. In the main, its argument on this issue consists of long quotations from trial testimony followed by GMS' opinion that, looking at the evidence in the light most favorable to it, the jury erred in crediting the testimony. (GMS' brief at 33-45.) In sum, rather than present a legal argument, GMS reargues its case. However, this court is not a finder of fact.

As the trial court discusses in its opinion, there was "more than adequate evidence" to put before a jury regarding GMS' breach of an oral contract "and

for the jury to rule in the class' favor." (Trial court opinion, 8/12/19 at 30.) After reviewing the record, we see no basis to upset the trial court's rulings denying GMS' preliminary objections and motion for summary judgment, and we affirm the trial court's order denying GMS' post-trial motions because there was record evidence from which the jury could reach its verdict. See Brown v. Progressive Insurance Co., 860 A.2d 493, 497 (Pa.Super. 2004) ("Concerning questions of credibility and weight accorded evidence at trial, we will not substitute our judgment for that of the finder of fact."), appeal denied, 872 A.2d 1197 (Pa. 2005) (parallel citation omitted); see also Commonwealth v. Hawkins, 701 A.2d 492, 501 (Pa. 1997) (the credibility of witnesses is "solely for the jury to determine"), cert. denied, 523 U.S. 1535 (1998) (parallel citations omitted).

We acknowledge "[i]t is the function of the jury to evaluate evidence adduced at trial to reach a determination as to the facts, and where the verdict is based on substantial, if conflicting evidence, it is conclusive on appeal." Commonwealth v. Reynolds, 835 A.2d 720, 726 (Pa.Super. 2003) (internal citation omitted). In Morin v. Brassington, 871 A.2d 844, 852-853 (Pa.Super. 2005), we declined to reweigh the evidence on appeal in a breach of oral contract action, and affirmed the trial court's verdict in plaintiff's favor, despite incredible accusations made by both parties regarding the actual existence of the agreement. Id. The Morin court ruled it "[would] not invade the credibility-determining powers of the fact-finder merely because the

evidence was conflicting and the fact-finder could have decided the case either way." Id. at 852. Likewise, we will not "invade the credibility-determining powers of the fact-finder" in the present case. GMS' third and fourth claims do not merit relief.

In its fifth issue, GMS contends the trial court erred in awarding attorneys' fees for work done in preparation for the federal lawsuit. (GMS' brief at 45-49.) However, GMS' waived this claim.

We review this claim under the following standard. "Appellate review of an order of a tribunal awarding counsel fees to a litigant is limited solely to determining whether the tribunal palpably abused its discretion in making the fee award." Braun v. Wal-Mart Stores, Inc., 24 A.3d 875, 974 (Pa.Super. 2011), affirmed, 106 A.3d 656 (Pa. 2014) (parallel citations omitted), cert. denied, 136 S.Ct. 1612 (U.S. 2016) (parallel citations omitted). In general, "the manner by which attorneys' fees are determined in this Commonwealth, under fee-shifting provisions, is the lodestar approach." Krishnan v. Cutler Group, Inc., 171 A.3d 856, 903 (Pa.Super. 2017) (citation omitted). The lodestar is the product of "the number of hours reasonably expended on the litigation times a reasonable hourly rate." Id. The lodestar is "strongly presumed to yield a reasonable fee." Logan v. Marks, 704 A.2d 671, 674 (Pa.Super. 1997). A court has the discretion to adjust the lodestar fee in light of the degree of success, the potential public benefit achieved, and the potential inadequacy of the private fee arrangement.

*Id.* Further, the lodestar "should be reduced in proportion to time spent on distinct claims which do not produce finding of liability. After finalizing the lodestar, the court may then apply a multiplier, i.e., enhancement." *Braun*, 24 A.3d at 975 (internal citation omitted).

Here, GMS does not dispute the award of attorneys' fees in general, but disputes the award of fees expended in the federal court case. (GMS' brief at 45-49.) However, they admit they can find no legal support for their claim. (*Id.* at 46 n.8.) Moreover, GMS fails to provide any detailed information regarding the facts underlying their claim. (*Id.* at 45-49.) While it says the trial court awarded "over $100,000 in attorneys' fees for time spent unsuccessfully litigating the FLSA claim" (GMA's brief at 45-46), it completely fails to specify how it arrived at the figure.

In its opinion, the trial court attached several pages of tables to the decision showing how it parsed out the award of attorneys' fees. (See trial court opinion, 8/12/19 at Exhibit A.) GMS does not specify which specific fees it is challenging. (GMS' brief at 45-49.) We have reviewed the charts; and our review demonstrates the trial court differentiated between time spent working on the federal claims and time spent working on the state-law claims, and did not award any fees for time spent on the unsuccessful FLSA claims. (See trial court opinion, 8/12/19 at Exhibit A.) Thus, we are unable to discern the basis of GMS' claims.

We remind GMS it is not this court's responsibility to comb through the record seeking the factual underpinnings of its claim. Commonwealth v. Mulholland, 702 A.2d 1027, 1034 n.5 (Pa.Super. 1997) ("In a record containing thousands of pages, this court will not search every page to substantiate a party's incomplete argument."). Further, "[w]here defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived." Sephakis v. Pa. State Police Bureau of Records and Certification, 214 A.3d 680, 686-687 (Pa.Super. 2019) (holding claim waived were appellant failed to properly develop it) (internal quotation marks and citations omitted), appeal denied, 223 A.3d 672 (Pa. 2020). Therefore, we find GMS waived its fifth issue.[8]

---

[8] In any event, even if we were to reach the merits, we would reject GMS' argument. Firstly, its reliance on Hensley v. Eckerhart, 461 U.S. 424 (1983) (parallel citations omitted), is misplaced. Hensley stands for the proposition where there is a mixture of successful and unsuccessful claims, the trial court must not award fees on the unsuccessful claims and should only award fees "that [are] reasonable in relation to the results obtained." Hensley, 461 U.S. at 424. That is exactly what the trial court in the instant matter did, as the charts attached to its decision demonstrate. (See trial court opinion, 8/12/19 at Exhibit A.) Secondly, again, we find GMS' attempt to penalize the class, because the federal court declined to exercise jurisdiction over the state-law claims, the very result GMS wanted, to be, at best, disingenuous. The class is entitled to attorneys' fees on the successful claims; the fact the federal court did not exercise jurisdiction over them does not demonstrate the claims were unsuccessful, and we see no relevance to the fact attorneys for the class worked on them during the pendency of the case in federal court.

In its sixth issue, GMS complains the trial court erred in awarding liquidated damages. (GMS' brief at 50-60.) We disagree.

The WPCL provides in pertinent part:

> Where wages remain unpaid for thirty days beyond the regularly scheduled payday, or, in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employe [sic] of a proper claim or for sixty days beyond the date of the agreement, award or other act making wages payable, or where shortages in the wage payments made exceed five percent (5%) of the gross wages payable on any two regularly scheduled paydays in the same calendar quarter, and no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment, the employe [sic] shall be entitled to claim, in addition, as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater.

43 P.S. § 260.10. This "claim requires us to consider the proper interpretation of § 260.10, making the issue a question of law for which our standard of review is de novo and our scope of review is plenary." Braun, 24 A.3d at 960 (citations omitted). This court has stated, "[t]he WPCL is not only a vehicle for recovery of unpaid wages; it also provides for damages in the event an employer withholds compensation in the absence of good faith." Id. at 961 (citation omitted). If a claimant establishes wages are owed under Section 260.10, it is the employer's burden to establish good faith, not the employees' burden to establish bad faith, and the employer must prove it by clear and convincing evidence. Id. at 961-63 (citation omitted); see also

Andrews v. Cross Atlantic Capital Partners, 158 A.3d 123, 134 (Pa.Super. 2017) (en banc) (citation omitted).

Here, for reasons which are not apparent, GMS chose not to present any evidence, either testimonial or documentary, regarding good faith and also chose not to have the jury charged on this issue. (Trial court opinion, 8/12/19 at 17.) Instead, GMS decided to adopt, at the trial court, the same erroneous legal theory they pursue here; namely, that it is not their burden to prove good faith but rather it was the class' burden to prove bad faith. (Id.; GMS' brief at 50-60.) As discussed above, this is simply not a correct statement of law. See Braun, 24 A.3d at 961-63; see also Andrews, 158 A.3d at 134. Moreover, on appeal, GMS argues we should focus on its litigation conduct in defining good faith; in essence saying, as long as it had a reasonable legal basis for withholding the wages, it acted in good faith. (GMS' brief at 50-60.) However, in Braun, supra, we specifically rejected a similar claim. Braun, 24 A.3d at 965-966. GMS' claim the class was not entitled to liquidated damages because it failed to prove bad faith does not merit relief.

In its seventh and final issue, GMS contends the trial court erred and abused its discretion in awarding pre-judgment interest. (GMS' brief at 60-64.) GMS argues, in order to be entitled to pre-judgment interest, "the contract itself" must "contain[] a fixed standard by which to calculate damages[.]" (Id. at 63.) It notes, in the instant matter, because there was

no written contract, the parties agreed to a compromise, based on two expert reports, about the amount due. (Id.)

> It is well-established that in a contract action, an award of prejudgment interest does not depend upon discretion, but is a legal right and must be awarded despite the good faith of the party contesting the claim. The purpose of awarding interest as damages is:
>
>> to compensate an aggrieved party for detention of money rightfully due him or her, and to afford him or her full indemnification or compensation for the wrongful interference with his or her property rights. The allowance of interest as an element of damages is not punitive, but is based on the general assumption that retention of the money benefits the debtor and injures the creditor.

Andrews, 158 A.3d at 136-137 (internal citations omitted).

> Our review of an award of pre-judgment interest is for abuse of discretion. Our Supreme Court has emphasized:
>
>> When a court comes to a conclusion through the exercise of its discretion, there is a heavy burden to show that this discretion has been abused. It is not sufficient to persuade the appellate court that it might have reached a different conclusion, it is necessary to show an actual abuse of the discretionary power. An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

> Absent an abuse of that discretion, we will not disturb the ruling of the trial court.

Linde v. Linde, 220 A.3d 1119, 1150 (Pa.Super. 2019) (internal citations and quotation marks omitted), appeal denied, 236 A.3d 1048 (Pa. 2020).

Here, the trial court discussed the issue as follows:

> Pennsylvania follows the Restatement (Second) of Contracts § 354, which, provides:
>
> (1)   If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.
>
> (2)   In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.
>
> Restatement (Second) of Contracts § 354(1)-(2) (1981) as cited in Cresci Const. Servs., Inc. v. Martin, 64 A.3d 254, 259 (Pa.Super. Ct. 2013).
>
> In this instance, the nature of the breach was GMS' failure to pay wages for mandated pre and post-shift time rendered by the class. GMS has stipulated that the monetary value of such service was properly calculated by multiplying a "revised number of hours" by established regular and overtime rates of pay. (See [] Ex. E to [the class'] [a]mended [m]otion for damages and fees, p. 4-5[.]) The monetary value of uncompensated hours worked by the [] [c]lass was ascertainable.[Footnote 13] Further, the calculation of such value relied heavily upon documentation GMS possessed. The initial pursuit of payment in [f]ederal [c]ourt for relief, was not a cause of delay in payment. Long before the [f]ederal [c]ourt action was filed, GMS

mandated the use of its shuttle at times well before and after the scheduled shifts for the affected class. With the first paychecks that followed and continuing until the mandated use of the shuttle was discontinued, GMS was obligated to pay a definite sum in money to affected class members.

> [Footnote 13] GMS argued that the decision of Judge Pratter in Accurso v. Infra-Red Servs., Inc., CV 7509, 2018 WL 924985, at *11 (E.D. Pa. Feb. 16, 2018) should be similarly applied in this case. However, in Accurso "the contract at issue" did not contain a standard to determine the damages arising from a breach of confidentiality and non-compete provisions. Id. In this instance, the standard to determine damages was set and particularly known by GMS[] that is the hourly wage rates GMS determined to pay the affected class members.

> Therefore, an award of pre-judgment interest is proper. Such award is $418,132.07 through April 12, 2019. (See [] Ex. E to [the class'] [a]mended [m]otion for damages and fees, p. 8-9[.)]

Trial court opinion, 8/12/19 at 21-23.

We have reviewed the record and the briefs. GMS has failed to meet its heavy burden of showing the trial court abused its discretion in awarding pre-judgment interest. Linde, 220 A.3d at 1150. GMS' final issue does not merit relief.

Accordingly for the reasons discussed above, we find GMS' claims are either waived or do not merit relief. Therefore, we affirm.

J. A02039/20

Judgment affirmed.


Shogan, J. joins this Memorandum.

Olson, J. concurs in the result.


Judgment Entered.

*Joseph D. Seletyn*

Joseph D. Seletyn, Esq.
Prothonotary


Date:  12/24/2020